**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**TIFFANY G.,**

                                              **Plaintiff,**

                 **v.**                                                    **6:21-CV-385**
                                                                              **(FJS)**

**KILOLO KIJAKAZI,**
***Acting Commissioner of Social Security*,**

                                              **Defendant.**

---

**APPEARANCES**                              **OF COUNSEL**

**OLINSKY LAW GROUP**                        **HOWARD D. OLINSKY, ESQ.**
250 South Clinton Street
Suite 210
Syracuse, New York 13202
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**          **NATASHA OELTJEN, SAUSA**
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
Attorneys for Defendant

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Tiffany G. brought this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g) (the "Act"), seeking judicial review of a final decision of the Commissioner of Social

Security (the "Commissioner"), denying her application for benefits.  *See generally* Dkt. Nos. 1,

17.  Pending before the Court are the parties' cross-motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  *See* Dkt. Nos. 17, 19.

## II. PROCEDURAL HISTORY AND BACKGROUND

Plaintiff brought her current claim for disability insurance benefits on April 19, 2018, alleging disability as of September 1, 1998.  *See* Dkt. No. 12, Administrative Record ("AR"), at 13.[1]  Plaintiff's claim was initially denied on August 16, 2018, and she filed a written request for a hearing on November 27, 2018.  *See id.*  Due to the extraordinary circumstances presented by the COVID-19 pandemic, a telephone hearing was held on May 6, 2020, before Administrative Law Judge Robyn Hoffman ("the ALJ").  *See id.* at 13, 35-63.  Ms. Terry Schmidt, a non-attorney representative from the Olinsky Law Group, represented Plaintiff at the hearing.  *See id.* at 13, 37.  Upon advice of counsel, Plaintiff amended her alleged onset date to April 19, 2018, the filing date, at the hearing.  *See id.* at 43.

On June 16, 2020, the ALJ issued a written decision in which she made the following findings "[a]fter careful consideration of the entire record…"

1)  Plaintiff "has not engaged in substantial gainful activity since April 19, 2018, the application date."

2)  Plaintiff "has the following severe impairments: asthma; chronic obstructive pulmonary disease (COPD); lumbar spine mild scoliosis; right knee osteoarthritis; adjustment disorder with mixed anxiety and depressed mood; post-traumatic stress disorder (PTSD); and opioid use in remission."

---

[1] All references to page numbers in the Administrative Record are to the Bates Stamp numbers in the bottom right corner of those pages.  All references to page numbers in other documents in the record are to the page numbers that the Court's ECF system generates, which appear in the top right corner of those pages.

3) Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1."

4) Plaintiff "has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 416.967(a). Specifically, [Plaintiff] can occasionally lift and carry ten pounds. [Plaintiff] can sit for approximately six hours and stand or walk for approximately two hours, all in an eight-hour workday with normal breaks. [Plaintiff] should avoid exposure to excessive amounts of respiratory irritants such as dust, odors, fumes, and gases and extreme hot and cold temperatures. [Plaintiff] retains the ability to understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with all others to the extent necessary to carry out simple tasks. [Plaintiff] can handle simple, repetitive work-related stress in that [she] can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require [her] to supervise or manage the work of others."

5) Plaintiff "has no past relevant work."

6) Plaintiff "was born on February 9, 1990 and was 28 years old, which is defined as a younger individual age 18-44, on the date the application was filed."

7) Plaintiff "has at least a high school education and is able to communicate in English."

8) "Transferability of job skills is not an issue because [Plaintiff] does not have past relevant work."

9) "Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."

10) Plaintiff "has not been under a disability, as defined in the Social Security Act, since April 19, 2018, the date the application was filed."

*See* AR at 15-27 (citations omitted).

The ALJ's decision became the Commissioner's final decision on February 2, 2021,

when the Appeals Council of the Social Security Administration denied Plaintiff's request for

review. *See* AR at 1. Plaintiff then commenced this action on April 3, 2021, filing a supporting

brief on January 17, 2022. *See* Dkt. Nos. 1, 17. Defendant filed a responsive brief on March 3,

2022.  *See* Dkt. No. 19.  In support of her motion, Plaintiff argues that the ALJ's finding with

respect to her residual functional capacity ("RFC") lacks substantial support in the record

because the ALJ (1) improperly evaluated opinions from Thomas Butler, LMSW,[2] and Timothy

Jones, N.P., and (2) erroneously used her activities of daily living to discount her impairments.

*See generally* Dkt. No. 17 at 9-15.  Plaintiff also argues that the ALJ did not obtain any

vocational expert testimony, which was necessary because of the non-exertional limitations

contained in the RFC.  *See id.* at 15-16.

### III. DISCUSSION

**A.  Standard of review**

Absent legal error, a court will uphold the Commissioner's final determination if there is

substantial evidence to support it.  *See* 42 U.S.C. § 405(g).  The Supreme Court has defined

substantial evidence to mean "'more than a mere scintilla'" of evidence and "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  Accordingly, a reviewing court "'may

not substitute [its] own judgment for that of the [Commissioner], even if [it] might justifiably

have reached a different result upon a de novo review.'"  *Cohen v. Comm'r of Soc. Sec.*, 643 F.

App'x 51, 52 (2d Cir. 2016) (Summary Order) (quoting *Valente v. Sec'y of Health & Human*

*Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).  In other words, "[t]he substantial evidence

standard means once an ALJ finds facts, [a reviewing court may] reject those facts 'only if a

---

[2] Although Plaintiff challenges the ALJ's rejection of "LMSW Butcher's" opinion throughout
her memorandum of law, it is clear from the hearing decision and the evidence in the record that
she is referring to Mr. Butler's opinion.

reasonable factfinder would *have to conclude otherwise*.'"  *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 448 (2d Cir. 2012) (quotation and other citation omitted).

   To be eligible for benefits, a claimant must show that she suffers from a disability within the

meaning of the Act.  The Act defines "disability" as an inability "to engage in any substantial

gainful activity [("SGA")] by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  To

determine if a claimant has sustained a disability within the meaning of the Act, the ALJ

follows a five-step process:

1)   The ALJ first determines whether the claimant is currently engaged in SGA.  *See* C.F.R.
     §§ 416.920(b), 416.972.  If so, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(b).

2)   If the claimant is not engaged in SGA, the ALJ determines if the claimant has a severe
     impairment or combination of impairments.  *See* 20 C.F.R. § 416.920(c).  If not, the
     claimant is not disabled.  *See id.*

3)   If the claimant has a severe impairment, the ALJ determines if the impairment meets or
     equals an impairment found in the appendix to the regulations (the "Listings").  If so, the
     claimant is disabled.  *See* 20 C.F.R. § 416.920(d).

4)   If the impairment does not meet the requirements of the Listings, the ALJ determines if
     the claimant can do her past relevant work.  *See* 20 C.F.R. § 416.920(e), (f).  If so, the
     claimant is not disabled.  *See* 20 C.F.R. § 416.920(f).

5)   If the claimant cannot perform her past relevant work, the ALJ determines if she can
     perform other work, in light of her RFC, age, education, and experience.  *See* 20 C.F.R.
     § 416.920(f), (g).  If so, then she is not disabled.  *See* 20 C.F.R. § 416.920(g).  A
     claimant is only entitled to receive benefits if she cannot perform any alternative gainful
     activity.  *See id.*

For this test, the burden of proof is on the claimant for the first four steps and on the

Commissioner for the fifth step if the analysis proceeds that far.  *See Balsamo v. Chater*, 142

F.3d 75, 80 (2d Cir. 1998) (citation omitted).

**B. Whether the evidence in the record substantially supports the ALJ's RFC finding**

In support of her motion, Plaintiff argues that the ALJ's RFC finding lacks substantial support in the record because she improperly discounted N.P. Jones's and Mr. Butler's opinions, and improperly relied on Plaintiff's activities of daily living to reject evidence regarding the severity of Plaintiff's impairments. *See generally* Dkt. No. 17 at 9-15. The Court addresses each of these issues in turn.

### 1. *Mr. Butler's and N.P. Jones's opinions*

Plaintiff argues that the ALJ improperly found Mr. Butler's and N.P. Jones's opinions "not persuasive." *See* Dkt. No. 17 at 10. Plaintiff contends that the ALJ points to "some benign findings" in the medical record to disregard their opinions, even though both providers supported their limitations with specific information. *See id.* at 11-12. According to Plaintiff, the ALJ failed to provide any good reason for discounting the supportability of the opinions; and, therefore, she did not properly evaluate the supportability factor as the regulations require. *See id.* at 12. Plaintiff also notes that, upon a closer look at the evidence on which the ALJ relied, there is not any inconsistency with the record and with the providers' opinions. *See id.* at 13.

"In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations." *Lynn J. v. Kijakazi*, No. 3:20-CV-1294 (ATB), 2022 WL 912981, *6 (N.D.N.Y. Mar. 29, 2022) (citing 20 C.F.R. §§ 404.1545, 416.945) (other citations omitted). For disability claims filed on or after March 27, 2017, "the Commissioner 'will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from [the claimant's] medical sources.'" *Kathleen M. v. Comm'r of Soc. Sec.*, No. 8:20-cv-1040 (TWD), 2022 WL 92467, *5 (N.D.N.Y. Jan. 10, 2022) (Dancks, M.J.) (quoting 20 C.F.R. § 404.1520c(a); *see also Howard D. v. Saul*, No. 5:19-CV-01615 (BKS), 2021 WL 1152834, at *11 (N.D.N.Y. Mar. 26, 2021)).  "Rather, the ALJ must use five factors to determine the persuasiveness of the medical opinion evidence and prior administrative medical findings: supportability; consistency; relationship with the claimant; specialization; and other factors, such as 'a medical source's familiarity with the other evidence in a claim.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)-(c); *see also Howard*, 2021 WL 1152834, at *11).  "The two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability[.]'" *Andrew G. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0942 (ML), 2020 WL 5848776, *5 (N.D.N.Y. Oct. 1, 2020) (Lovric, M.J.) (quotation omitted).

"An ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." *Id.* (quoting 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)).  "With respect to 'supportability,' the new regulations provide that '[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.'" *Id.* (quoting [20 C.F.R.] §§ 404.1520c(c)(1), 416.920c(c)(1)).  "The regulations provide that with respect to 'consistency,' '[t]he more consistent a medical opinion(s) or prior administrative medical findings(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.'" *Id.* (quoting [20 C.F.R.] §§ 404.1520c(c)(2), 416.920c(c)(2)).

Mr. Butler conducted therapy sessions with Plaintiff from 2017 through 2020.  *See* AR at 864-898.  At his comprehensive assessment, he noted that Plaintiff complained of depression, anxiety, panic attacks, some paranoia, flashbacks, deja vu experiences, and hypervigilance, which she had since childhood as a result of childhood sexual abuse.  *See id.* at 336.  Plaintiff also reported to him that she was an active drug addict for ten years.  *See id.*  According to Mr. Butler, Plaintiff explained that she was "more stable in terms of her depression and anxiety when she was on her medications," and without them her symptoms intensified, and she experienced some panic attacks.  *See id.* at 337-339.  During her mental status examination, Mr. Butler noted that Plaintiff was pleasant and cooperative with direct eye contact and erect posture.  *See id.* at 339.  Plaintiff denied delusions, suicidal, or homicidal ideations.  *See id.*  She experienced crying episodes and tearfulness.  *See id.*  She also reported that she had experienced a relapse and lost her psychiatric medication.  *See id.*

Mr. Butler diagnosed Plaintiff with general trauma and stressor related disorders causing mixed anxiety and depressed mood and substance use disorders, which included severe opioid use disorder and moderate tobacco use disorder.  *See id.* at 897.  At that time, Plaintiff was pregnant, clean and sober, compliant with Utica drug court, had "full affect with anxiety," was neither suicidal nor homicidal, was well groomed with good hygiene, and had "some difficulties with attention and organization of her thinking."  *See id.*  In addition to these notes at her next appointment, Mr. Butler indicated that Plaintiff was "quite anxious" in the waiting room, her husband was attempting to help her deal with her fears stemming from an incident when a stranger violently attacked her in her home, and she was addressing some of her hypervigilance and checking.  *See id.* at 895.  Mr. Butler further noted that Plaintiff used artwork, milestones, and church and volunteer work to manage her symptoms, and her husband offered help and

support as well. *See id.* at 896.  Mr. Butler ultimately changed Plaintiff's diagnosis at that time to posttraumatic stress disorder ("PTSD") and adjustment disorder with mixed anxiety and depressed mood and other mixed emotional features. *See id.* at 894.

In later appointments, Mr. Butler noted that Plaintiff had to stop taking her psychiatric medications and dealt with fatigue due to treatment for Hepatitis C, but she still reported that she was able to relax, care for her daughter and apartment, and sleep; and she often had a "flat affect" with congruent or anxious and depressed mood. *See id.* at 886, 888, 891, 893.  Mr. Butler frequently remarked that Plaintiff was "quite attentive" during her sessions, well groomed, working on being assertive, and she set boundaries with her husband, who was verbally abusive toward her. *See id.* at 864, 871, 883, 868, 888, 893.  Mr. Butler identified that Plaintiff's relationship with her husband was her "primary trigger" for stress, but she had found "some improvement" using relaxation skills. *See id.* at 885.

Plaintiff also suffered from increased anxiety, anger, and depression while experiencing issues with her cardiac system and low blood pressure. *See id.* at 883.  She also suffered from Lyme disease, requiring IV infusions, which "caused an increase in her anxiety level" and "intensified her symptoms" but had "not caused a decrease in her activity level or responsibilities." *See id.* at 880.  Generally, Mr. Butler noted that Plaintiff's "medical issues" triggered "an increase in anxiety[.]" *See id.* at 883.

Mr. Butler later acknowledged that he had not seen Plaintiff "for some time due to her treatment for Lyme disease," and she had "more energy and more color in her face." *See id.* at 877.  At that time, Plaintiff was able to relax when she spent time with friends and her daughter, learned to stand up to her husband, and they were in the process of moving. *See id.*  Plaintiff reported some problems with breakthrough anxiety, but her eye contact was direct, she had

erect posture, and she brightened when talking about her daughter. *See id.* Mr. Butler also

noted that Plaintiff was "able to communicate her thoughts in a rational manner" and her

"overall presentation was assertive and goal-directed." *See id.* As a result of the Lyme disease,

however, Mr. Butler believed that Plaintiff's memory and concentration had gotten worse. *See*

*id.* at 868.

In more recent appointments, Plaintiff complained of losing weight and experiencing a

decreased heartrate, and she was unable to relax because she was busy caring for her daughter,

moving to a new apartment, actively involved in assisting her brother in an addiction treatment

program, and keeping up her apartment with very little assistance from her husband. *See id.* at

874. Plaintiff continued to feel as if she did "way too much" without help from her husband and

felt that "everything [was] on her shoulders." *See id.* She complained that she did not have

time for herself or for relaxation. *See id.* at 868, 874. She also continued to appear with a

depressed and anxious mood. *See id.* at 871, 874. However, Mr. Butler noted that Plaintiff was

"friendly and cooperative" except that she was "rather pessimistic" when discussing her

marriage, which had turned physically abusive and which "cause[d] major setbacks in her

symptoms" that were "already overwhelming and chronic." *See id.* at 864, 868, 871, 874.

Plaintiff believed the altercation with her husband was causing her to lose a great deal of hair,

further affected her memory and concentration, and she experienced nightmares that awoke her

during the night. *See id.* at 864. Notwithstanding her depressed and anxious mood when

discussing her marriage, Mr. Butler continued to note that Plaintiff was fully oriented, and her

associations were clear, concise, and congruent. *See id.* at 868.

In Mr. Butler's medical source statement, on which N.P. Jones signed off, he diagnosed

Plaintiff with PTSD and adjustment disorder with mixed anxiety and depression as well as

opioid use disorder in full remission.  *See id.* at 624.  Mr. Butler noted that Plaintiff's prognosis was "guarded," and her symptoms included appetite disturbance with weight change, decreased energy, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, psychomotor agitation, emotional withdrawal or isolation, emotional lability, persistent disturbances of mood or affect, easy distractibility, memory impairment, and sleep disturbance.  *See id.*

Mr. Butler only found that Plaintiff had "unlimited or very good" mental abilities with respect to adhering to basic standards of neatness and cleanliness.  *See id.* at 625.  He found that Plaintiff was "unable to meet competitive standards" with respect to understanding and remembering short and simple instructions, carrying out short and simple instructions, making simple work-related decisions, asking simple questions, and being aware of normal hazards and taking appropriate precautions.  *See id.*  Mr. Butler concluded that Plaintiff had "no useful ability to function" with respect to remembering work procedures, maintaining attention for two hour segments, maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, interacting appropriately with the general public, maintaining socially appropriate behavior, traveling to unfamiliar places, and using public transportation.  *See id.*

To support his findings with respect to those limitations, Mr. Butler remarked that, due to "trauma symptoms," Plaintiff is "unable to deal with groups or external stress." *See id.* However, Mr. Butler noted that Plaintiff "would be able to deal with the general public." *See id.* Mr. Butler also indicated that Plaintiff did not have a low IQ or reduced intellectual functioning and her psychiatric conditions did not exacerbate her pain or physical symptoms. *See id.* at 626.  He also stated that Plaintiff's deficiencies in concentration, persistence, and pace would result in her failure to complete tasks in a timely manner, and she would be off-task more than 20% of a given workday and absent from work more than four days per month.  *See id.*

In N.P. Jones's diagnostic evaluation of Plaintiff, he found that she appeared appropriately dressed and groomed, she was pleasant and cooperative, clear, coherent, and with relevant and logical speech.  *See id.* at 341-342.  Plaintiff denied any history of paranoia, auditory or visual hallucinations, or delusional thinking.  *See id.* at 342.  Plaintiff reported having dreams that she did not remember and flashbacks of abuse that she suffered as a child. *See id.*  N.P. Jones diagnosed her with "adjustment disorder with anxiety and depressed mood," as well as substance-related use disorders, and noted that she was young, "in good physical health," and seemed motivated.  *See id.* at 342-343.

After one month on medication, Plaintiff reported to N.P. Jones that her anxiety was "much better controlled" and she reported no issues with depression.  *See id.* at 344.  She also denied thoughts of self-harm, stated that she generally slept well, reported that her nightmares were becoming less frequent, and was "pleasant and friendly."  *See id.*  At her next appointment with N.P. Jones, Plaintiff stated she stopped taking clonidine because she believed it made her blood pressure too low.  *See id.* at 348.  She complained of increased anxiety and depression but denied any thoughts of self-harm.  *See id.*  Plaintiff also continued to maintain her sobriety and

- 12 -

voiced no other complaints. *See id.* Plaintiff later reported to N.P. Jones that she stopped taking buspar because she thought it was making her too tired, and she complained of apathy and increased depression. *See id.* at 352. However, Plaintiff reported that her anxiety seemed better. *See id.* After learning of her pregnancy, Plaintiff cut her Lexapro dosage but "stated that she had been doing well." *See id.* at 356. She continued to do well on her medications at her next appointment. *See id.* at 360.

In April 2020, N.P. Jones followed up with Plaintiff for medication management over the phone, and she was "pleasant and conversant." *See id.* at 862. Plaintiff reported that she continued to struggle with depression, but N.P. Jones noted that Plaintiff had many physical issues that may have contributed to the depression. *See id.* Plaintiff also complained of difficulty sleeping, but, after taking a low dose of Remeron, she stated she was "sleeping somewhat better." *See id.* N.P. Jones increased her Remeron prescription and continued Plaintiff's other prescriptions for Gabapentin, Vistaril, and Lexapro. *See id.* Plaintiff denied any thoughts of self-harm, hallucinations, or paranoia, and she did not show evidence of delusional thinking. *See id.*

In N.P. Jones's medical source statement, he found that Plaintiff had marked limitations in understanding and remembering simple instructions and carrying out simple instructions, and she had extreme limitations in making judgments on simple work-related decisions, understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions. *See id.* at 597. To support these findings, N.P. Jones noted that Plaintiff had "longstanding difficulty" with following instructions, which became worse after she was diagnosed and treated for Lyme disease, which had a "significant impact" on her memory. *See id.* N.P. Jones also remarked that Plaintiff had

serious cardiac problems that made her PTSD worse.  *See id.*  He additionally found that

Plaintiff had marked limitations in interacting appropriately with the public and with co-

workers and extreme limitations in interacting appropriately with supervisors and in responding

appropriately to usual work situations and changes in a routine work setting.  *See id.* at 598.

N.P. Jones further found that Plaintiff had other capacities that were affected by her

impairments, including her ability to get out and socialize, and he noted that Plaintiff no longer

had friends and that she reportedly needed to leave her husband after his drug use and assaulting

her.  *See id.*  N.P. Jones also noted that Plaintiff had been clean and sober since May 25, 2017,

but her PTSD, depression, and anxiety continued.  *See id.*  He remarked that Plaintiff "struggled

with health issues, marital issues, heart stopping after giving birth," and "emotionally she has

experienced a great deal of upheaval."  *See id.*  Finally, N.P. Jones indicated that Plaintiff could

manage benefits in her own best interest.  *See id.* at 599.

      In her decision, the ALJ acknowledged that Plaintiff alleged that she was unable to work

due to symptoms related to PTSD, depression, anxiety, and drug addiction.  *See id.* at 22.

Additionally, Plaintiff complained of poor sleep, dysphoria, crying spells, fatigue, loss of

energy, memory deficits, concentration problems, and diminished sense of pleasure.  *See id.*

She also reported that she was unable to travel alone due to her anxiety, flashbacks, and

hypervigilance related to a history of sexual assault.  *See id.*  The ALJ also noted that Plaintiff

had a history of heroin and crack cocaine use from 2006 until June 2017, for which Plaintiff

stated she attended weekly treatment.  *See id.*

      The ALJ then summarized the above-described treatment records from Mr. Butler and

N.P. Jones, noting that Plaintiff frequently appeared for her appointments appropriately dressed

and groomed, denied self-harm, maintained her sobriety, had good hygiene, made direct eye

contact, had erect posture, and did not have any suicidal or homicidal ideations.  *See id.*
Additionally, the ALJ remarked that Plaintiff's 2018, 2019, and 2020 therapy sessions with Mr.
Butler evidenced "unremarkable findings."  *See id.*  The ALJ also pointed out that Plaintiff
reported caring for her infant daughter and two of her brother's children and was coping with
mental health symptoms even when she could not take her psychotropic medications due to
contemporaneous medical issues.  *See id.*  The ALJ further acknowledged that Plaintiff was able
to communicate her thoughts in a rational manner, her overall presentation was assertive and
goal directed, she was proactive in caring for her medical conditions and caring for her child,
and her associations were clear, concise, and congruent.  *See id.* at 23.  According to the ALJ,
the treatment records also provided that Plaintiff was alert and cooperative with normal mood
and affect and normal attention span and concentration.  *See id.*  Based on this evidence, the
ALJ concluded that, although Plaintiff "has a history of substance abuse, even considering her
substance abuse, [she] does not have disabling limitations, thus substance abuse is not material
in this case."  *See id.*  Nonetheless, the ALJ remarked that she "considered all of [Plaintiff's]
mental health impairments, singularly and in combination, including her substance abuse and
the applicability of SSR 13-2p, and reflected appropriate limitations" in the RFC.  *See id.*

        In discussing N.P. Jones's and Mr. Butler's medical source opinions, the ALJ recognized
that N.P. Jones assessed that Plaintiff had moderate to extreme limitations in her ability to
understand, remember, and carry out simple and complex instructions, make judgments on
simple and complex work-related decisions, and interact with others.  *See id.* at 25.
Additionally, the ALJ noted that Mr. Butler assessed that Plaintiff was unable to meet
competitive standards or had no useful ability to function in all mental abilities needed to
perform work activities and that Plaintiff would be off-task more than 20% of the time and

absent more than four days per month.  *See id.*  The ALJ did not find either opinion persuasive, indicating that the "mental status findings of record do not support such profound limitations." *See id.*  The ALJ again pointed to the fact that Plaintiff had direct eye contact, erect posture, no suicidal or homicidal ideations, was able communicate her thoughts in a rational manner, was alert and cooperative with normal mood and affect, and had normal attention span and concentration.  *See id.*  The ALJ asserted that such medical findings were at odds with the "remarkably diminished functioning" that N.P. Jones and Mr. Butler assessed Plaintiff as having and "further d[id] not substantiate time off task and monthly absences."  *See id.* at 25-26. Nonetheless, based on all of the above-stated evidence, the ALJ remarked that Plaintiff's adjustment disorder with mixed anxiety and depressed mood and PTSD supported the need for mental limitations as provided in the RFC.  *See id.* at 26.

The ALJ clearly considered the supportability and consistency of N.P. Jones's and Mr. Butler's medical opinions when finding them "not persuasive."  She addressed their findings that Plaintiff had moderate to extreme limitations in all aspects of work and remarked that they were not supported by or consistent with the providers' own conclusions that Plaintiff had a normal affect, managed her mental illnesses even when she was physically ill or unable to take her psychotropic medications, had motivation and was goal-oriented, cared for her daughter and her home, had direct eye contact, erect posture, and did not have suicidal or homicidal ideations or delusions.  She also found that their opinions were inconsistent with the other medical opinions and evidence in the record, which revealed that Plaintiff had a higher level of functioning than N.P. Jones or Mr. Butler predicted.  The Court therefore holds that the ALJ did not err in finding those providers' medical opinions "not persuasive," and Plaintiff's RFC with certain mental limitations is substantially supported by the record.

### 2. *Activities of daily living*

Plaintiff also argues that the ALJ failed to explain how her activities of daily living discount the severity of her impairments. *See* Dkt. No. 17 at 14. Plaintiff asserts that the ALJ was required to "build a logical bridge showing how those daily activities translate to the ability to perform basic work functions on a five[-]day, eight[-]hour basis." *See id.* (citing *Meadors v. Colvin*, 13-CV-0160, 2015 WL 224759, *11 (N.D.N.Y. Jan. 15, 2015)). Instead, Plaintiff contends, the ALJ used her ability to care for her child and herself, as well as her hobbies, to discount licensed psychiatrists' and psychologists' opinions that Plaintiff could not sustain a job and had moderate to marked limitations. *See id.*

Under the regulations, an ALJ is "required to consider evidence of [the] [p]laintiff's daily activities when evaluating the medical opinion evidence." *Krystle H. v. Comm'r of Soc. Sec.*, No. 3:20-cv-855 (TWD), 2022 WL 888225, *7 (N.D.N.Y. Mar. 25, 2022) (Dancks, M.J.) (citing 20 C.F.R. § 404.1520c(c)(2); *Vellone* [*v. Saul*], [No. 1:20-cv-00261 (RA) (KHP)], 2021 WL 319354, at *6 [(S.D.N.Y. Jan. 29, 2021)]). ALJs are also required to consider a plaintiff's "daily activities when evaluating the intensity, persistence, and limiting effects of her symptoms." *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3P, 2017 WL 5180304 at *7-8). "These considerations, as well as evidence of Plaintiff's daily activities, inform the ALJ's RFC determination." *Id.* (citing 20 C.F.R. §§ 404.1545(a)(3), (e)).

In this case, the ALJ specifically noted that Plaintiff described daily activities that were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *See* AR at 23. The ALJ remarked that Plaintiff reported that she could care for her child independently, attend to self-care, prepare meals, clean, go shopping with her husband, and manage money. *See id.* Reviewing the evidence, the ALJ concluded that Plaintiff spent her

time caring for her daughter, doing general cleaning and laundry, keeping appointments, and watching television. *See id.* The ALJ indicated that Plaintiff stated she had no problem getting along with authority figures and she got along with friends and family members. *See id.* Furthermore, the ALJ stated, throughout 2019, Plaintiff "routinely denied physical disability and reported that her activities of daily living were normal." *See id.*

These findings are supported by Plaintiff's own testimony, in which she admitted that she went grocery shopping twice a month with her husband and during the day she took care of her daughter. *See id.* at 55. Plaintiff also reported occasionally taking care of her niece or nephew. *See id.* at 56, 61-62. In her therapy sessions, Plaintiff nearly always mentioned that she was taking care of her child, and she frequently mentioned that she was taking care of the apartment where she lived without help or support from her husband. *See generally id.* at 864-898. Her personal hygiene, dress, and grooming were also always appropriate. *See id.* Dennis M. Noia, Ph.D, a psychologist who examined Plaintiff, noted that she reported that she could dress, bathe, and groom herself, cook and prepare food, do general cleaning, laundry, shopping with her husband, and manage money. *See id.* at 375. However, Plaintiff neither drove nor used public transportation. *See id.* Plaintiff also self-reported in her Function Report that she could be in public and social with others, she prepared meals three times daily, plus snacks, she could do housework, and she liked to watch television. *See id.* at 234-237. Based on the foregoing, the Court finds that the ALJ properly considered Plaintiff's activities of daily living as she testified to them and as evidenced in the record when determining her RFC and limitations to work, and those activities substantially support the ALJ's ultimate RFC finding.

### 3. *Conclusion*

Based on the Court's determination that the ALJ's RFC finding is supported by Plaintiff's activities of daily living and that the ALJ did not err in finding N.P. Jones's and Mr. Butler's opinions "not persuasive," the Court further finds that the ALJ's RFC finding is supported by the substantial evidence in the record.

## C.  Whether the ALJ erred in failing to consult a vocational expert

Plaintiff lastly argues that the ALJ erred at Step 5 because she failed to obtain any vocational expert testimony when determining how the limitations set forth in the RFC would affect her ability to work.  *See* Dkt. No. 17 at 15.  According to Plaintiff, the ALJ failed to introduce evidence into the record that would tend to show that she was capable of performing any work given the limitations that Mr. Butler and N.P. Jones provided and given the non-exertional limitations in the RFC.  *See id.* at 16.  Plaintiff also contends that, given those non-exertional limitations, vocational expert testimony was necessary to determine whether she could perform any jobs at all in the national economy.  *See id.*

The Medical-Vocational guidelines, also known as "the Grids," "'take administrative notice of the numbers of unskilled jobs at various exertional levels that exist throughout the national economy.'"  *Erin G. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1595 (ATB), 2022 WL 580445, *13 (N.D.N.Y. Feb. 25, 2022) (Baxter, M.J.) (quoting *Guerrero v. Colvin*, No. 16 Civ. 3290 (RJS/AJP), 2016 WL 7339114, at *22 (S.D.N.Y. Dec. 19, 2016)) (footnote omitted).  However, "'[i]f a claimant has non-exertional limitations that "significantly limit the range of work permitted by his exertional limitations," the ALJ is required to consult with a vocational

expert.'" *Delossantos v. Comm'r of Soc. Sec.*, No. 7:16-CV-0713, 2017 WL 4011265, *8 (N.D.N.Y. Sept. 11, 2017) (Suddaby, C.J.) (quoting *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986))).  "'[T]he "mere existence of a non-exertional impairment does not automatically . . . preclude reliance on the [Medical-Vocational] guidelines."'" *Id.* (quoting *Zabala*, 595 F.3d at 410-11 (quoting *Bapp*, 802 F.2d at 603)).  "'A non-exertional impairment "significantly limits a claimant's range of work when it causes an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."'" *Id.* (quoting *Zabala*, 595 F.3d at 410-11 (quoting *Bapp*, 802 F.2d at 605-06)).

In this case, the ALJ imposed non-exertional limitations in that Plaintiff can occasionally lift and carry ten pounds, can sit for approximately six hours and stand or walk for approximately two hours, should avoid exposure to excessive amounts of respiratory irritants, and should avoid extreme hot and cold temperatures.  *See* AR at 19-20.  Additionally, the ALJ limited Plaintiff to making occasional decisions directly related to the performance of simple tasks in a position with consistent job duties, which does not require Plaintiff to supervise or manage the work of others.  *See id.* at 20.  The ALJ found that, if Plaintiff had the RFC to perform the full range of sedentary work, considering her age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.27.  *See id.* at 27.  The ALJ noted that "the additional limitations have little or no effect on the occupational base of unskilled sedentary work."  *See id.*  Therefore, she concluded that a finding of "not disabled" was also appropriate under the Grids.  *See id.*

Plaintiff has not demonstrated that her non-exertional impairments significantly limited her range of work, which is unskilled, sedentary work.  Thus, the ALJ was not required to consult with a vocational expert, and the Court finds that she appropriately used the Medical-Vocational guidelines to determine that there were a significant number of jobs in the national economy that Plaintiff could perform.  The Court accordingly finds that the ALJ appropriately concluded at Step 5 that Plaintiff is not disabled.


## IV. CONCLUSION

Having reviewed the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

ORDERS that Plaintiff's motion for judgment on the pleadings, *see* Dkt. No. 17, is **DENIED**; and the Court further

ORDERS that Defendant's motion for judgment on the pleadings, *see* Dkt. No. 19, is **GRANTED**; and the Court further

ORDERS that the Commissioner's decision is **AFFIRMED** and Plaintiff's complaint is **DISMISSED**; and the Court further

ORDERS that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated:  July 29, 2022
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge